IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NELSON H. ANTHOINE,

      Plaintiff,

    v.

NORTH CENTRAL COUNTIES
CONSORTIUM; LORI BROWN; and
CINDY NEWTON,

      Defendants.

_____/

No. 2:06-CV-01169 JAM KJM

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

    Nelson H. Anthoine ("Anthoine") brought this action against his former employer North Central Counties Consortium ("NCCC"), Lori Brown ("Brown") and Cindy Newton ("Newton") (collectively "Defendants") alleging civil rights violations and state law claims arising out of his termination. Defendants now move for summary judgment or, in the alternative, summary adjudication pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Anthoine opposes the motion.  For the reasons set forth below, Defendants' motion is GRANTED.[1]

## I. UNDISPUTED FACTS

Defendant NCCC is a public entity created by an agreement between Colusa County, Glen County, Lake County, Sutter County and Yuba County for the purpose of providing state and federal funds through the Workforce Investment Act ("WIA") to agencies providing job training services to businesses and jobseekers. Defs.' Undisputed Material Facts ("UMF") ¶¶ 1-3.  NCCC is governed by a Board consisting of one county supervisor from each member county.  Id. ¶ 5.  NCCC works with agencies to ensure compliance with the WIA and seeks to provide monitoring that supports program success by providing assistance and technical guidance.  Id. ¶ 4.

Defendant Brown was an independent consultant hired by NCCC to accomplish various tasks from 2001 to 2004, including conducting a re-classification study, meeting facilitation for NCCC leadership, strategic planning, developing policies and procedures, staff training and human resources support.  Defs.' UMF ¶ 7.  In 2005, NCCC hired Brown to serve as interim executive director of NCCC, a capacity in which she served from

---

[1] Because oral argument will not be of material assistance, the Court orders this matter submitted on the briefs.  E.D. Cal. L.R. 78-230(h).

January 27, 2005 to December 31, 2005.  Id. ¶ 9.  Defendant

Newton was a senior program analyst at NCCC responsible for

supervising NCCC's program monitoring efforts, including program

analysts.  Id. ¶ 10.  Plaintiff Anthoine was a program analyst

at NCCC from 1988 until his termination in May 2005.  Id. ¶¶ 11,

78.  One of Anthoine's principal duties as a program analyst was

to monitor local workforce development programs for compliance

with the WIA.  Compl. ¶ 7.  Specifically, from February 2004,

until his discharge on May 26, 2005, Anthoine monitored Upward

Bound, a workforce development program operated by the

California State University at Chico.  Defs.' UMF ¶ 56.

In 1990, 1993, 1994, 1996, 1998, and 2000, Anthoine was

graded by supervisors as, among other things, weak in complying

with instructions.  Defs.' UMF ¶¶ 14-17, 19, 21.  Several times

over this same period, Anthoine was also graded as unwilling to

accept or follow the philosophy of NCCC.  Id. ¶¶ 15, 19, 21.  In

particular, in 1998, in response to a project Anthoine was

unable to complete, Anthoine received a memo from NCCC's deputy

executive director, Bill Rottman ("Rottman"), stating: "It is

considered insubordinate by this office for you to hinder work

in progress as a result of your personal views of an issue or

procedure.  It is certainly inappropriate and unacceptable

conduct."  Id. ¶ 18.  On March 25, 2002, Newton warned Anthoine

that his failure to complete a particular assignment in a timely

manner was unacceptable and that future issues related to
unacceptable work performance could result in disciplinary
action.  Id. ¶ 22; Newton Decl., Exh. J.  Sometime later,
Anthoine was reassigned from monitoring duties and worked
primarily from home thereafter.  Defs.' UMF ¶ 23.

      In February 2004, Anthoine returned to monitoring duties at
NCCC.  Defs.' UMF ¶ 23.  In October 2004, Newton informed
Anthoine that several events between June and October of 2004
caused her to conclude that he had developed a pattern of not
following directions and warned him that any further behavior in
this regard could result in disciplinary action.  Id. ¶ 24.  In
early January 2005, Anthoine was assigned the task of processing
a backlog of case management reporting data (client data) for
submission to the state.  Id. ¶ 38.  In late January 2005,
Anthoine arranged a meeting with the chairman of NCCC's
governing Board, Gary Freeman ("Freeman"), to discuss the
following issues: the problem with NCCC's case management
reporting system, Newton's statement to the Board claiming that
NCCC was current in its obligation to provide client data to the
state, the potential litigation related to the case management
reporting system, Rottman filling the executive director
position, and Rottman ignoring his concerns that his work was
not being considered properly.  Id. ¶ 26.  According to
Anthoine, he arranged this meeting to "discuss several highly

4

important matters involving the overall direction and future of NCCC" and to raise his policy disagreements with Newton and higher managers.   Anthoine Decl. ¶ 7.   In particular, Anthoine asserts that he met with Freeman to inform him that, contrary to Newton's statements to the Board, NCCC was not current in its obligation to report client data to the state.   Id.   Anthoine maintains that he told Freeman this information not only because of its bearing on NCCC's obligation to the state, but also because it could impact the viability of any litigation launched by NCCC against Softscape, the company which provided NCCC with software that automated the gathering and uploading of client data to the state.   Id.   According to Anthoine, the delay in submitting client data to the state was due to the functional failure of Softscape's software. Id.

Following this meeting, Freeman spoke to Brown about Newton's statements to the Board regarding the submission of client data to the state.   Defs.' UMF ¶¶ 29, 31.   Thereafter, Brown met with Anthoine to discuss this issue.   Id. ¶ 31.   After this meeting, Brown investigated Anthoine's concerns and concluded that a problem did in fact exist with the case management reporting system and relayed this information to Newton.   Id. ¶ 32.   Brown and Newton subsequently spoke about how to resolve this issue.   Id.

On February 5, 2005, Newton gave Anthoine a memo notifying him of disciplinary action based on a "pattern of insubordination."  Defs.' UMF ¶ 33.  The memo set forth five incidents of insubordination and warned Anthoine that he needed to follow his supervisor's directions and to refrain from taking action not approved by his supervisor.  Id. ¶¶ 33-34; Newton Decl., Exh. L.  Specifically, Newton's memo stated: "I have held discussions with you on two separate occasions regarding five incidents of insubordination, specifically through your failure to follow directions.  Additionally, your failure to follow directions has negatively impacted your work performance as well as that of your co-workers.  Unfortunately, this behavior has continued, and as such disciplinary action has now been deemed necessary."  Newton Decl., Exh. L.  The memo also warned Anthoine that "further incident of insubordination shall result in disciplinary action up to and possibly including termination."  Defs.' UMF ¶ 33.

On February 14, 2005, Anthoine submitted a written response to the disciplinary action.  Defs.' UMF ¶ 35.  On February 24, 2005, Brown met with Anthoine to discuss several issues including, Anthoine's response to the disciplinary action, his complaint regarding work assignments, and his request to revoke the disciplinary action.  Id. ¶ 36.  On February 25, 2005, Anthoine submitted a formal grievance regarding his work

assignments, the disciplinary action, and Newton's alleged

practice of meeting with other program analysts without him.

Id. ¶ 37.  On March 25, 2005, Brown sent Anthoine a memo denying

his formal grievance.  Id. ¶ 39; Brown Decl., Exh. A.  In this

memo, Brown explained to Anthoine that even if his personal

philosophy differs from the philosophy of NCCC, he needs to be

mindful of NCCC's goal, which is to provide monitoring that

supports program success while ensuring quality through a high

level of customer service and technical assistance.  Brown

Decl., Exh. A.  On April 7, 2005, Anthoine appealed Brown's

decision to the Board.  Defs.' UMF ¶ 42.  Following Anthoine's

presentation of his case to the Board, which incidentally did

not include a complaint of gender discrimination, the Board

unanimously denied his grievance and specifically directed him

to follow the communication and decision making protocols

established by Newton and Brown.  Id. ¶¶ 44-49.  According to

Board chairman Freeman, he voted to deny Anthoine's grievance

because Brown had presented sufficient evidence of Anthoine's

insubordination.  Id. ¶ 50.

On March 17, 2005, Anthoine received his 2004 performance

evaluation, which graded him as "unsatisfactory" overall.

Defs.' UMF ¶ 51.  The evaluation stated that Anthoine has

"extreme difficulty following directions and taking supervision

from his supervisor," and that his work "frequently must be

revised or redone by his supervisor or coworkers." Id.  The
evaluation further stated that Anthoine's work does not always
reflect the philosophy of NCCC or a clear understanding of the
needs of his internal and external customers.  Id.

On April 20, 2005, Anthoine conducted a monitoring
appointment with Upward Bound.  Defs.' UMF ¶ 62.  Prior to this
appointment, Newton maintains that she directed Anthoine not to
discuss his concerns about Upward Bound's use of WIA funds
("funds") for college preparatory classes until she received an
answer from NCCC's state WIA liaison about whether Upward
Bound's use of funds for this purpose was proper.  Id. ¶¶ 57-58,
63.[2]  Notwithstanding Newton's alleged directive, Anthoine,
during the April 20, 2005 monitoring appointment, told Upward
Bound staff members that Upward Bound's use of funds for college
preparatory classes may not be allowable under the WIA and that
Upward Bound may have to pay those funds back.  Id. ¶ 64.
Anthoine also told Upward Bound staff that, in his opinion,
Upward Bound's use of funds for college preparatory classes was
unfair to other programs.  Id.  Anthoine maintains that he

_____

[2] Anthoine denies that Newton directed him not to express
his concerns about Upward Bound's use of funds for college
preparatory classes prior to the April 20, 2005 monitoring
appointment.  Anthoine, however, acknowledges that both Newton
and Brown specifically told him that they did not believe that
Upward Bound's use of funds for college preparatory classes
violated the WIA.  Defs.' UMF ¶ 59.

expressed his opinion in this regard because he wanted to influence NCCC management to make these funds available to other programs that emphasized bona-fide work-site experience for disadvantaged youth who do not plan on attending college.  Id. ¶ 65.  In Anthoine's opinion, Upward Bound's use of funds for college preparatory classes was inappropriate because it did not comport with the intent of the WIA, which is to support programs that assist disadvantaged youth in gaining work experience.  Id.

Following the monitoring appointment, two Upward Bound staff members contacted Newton and complained about Anthoine's statements regarding Upward Bound's use of funds for college preparatory classes.  Defs.' UMF ¶¶ 66, 68, 71.  On May 13, 2005, Newton informed Brown that she had directed Anthoine prior to the monitoring appointment not to discuss his concerns with Upward Bound staff about Upward Bound's use of funds for college preparatory classes.  Id. ¶ 70.  On May 19, 2005, Brown received the complaint statements made by the Upward Bound staff members.  Id. ¶ 71.  Thereafter, Brown decided to terminate Anthoine based on her belief that he was unwilling or unable to correct his performance issues, follow directions, promote NCCC's philosophy over his own, id. ¶ 72, and represent programs and services accurately.  Decl. of Brown ¶ 12.  According to Brown, she viewed the written complaint statements as a confirmation and continuation of Anthoine's pattern of knowingly and overtly

refusing to follow directions and promoting his own opinions over the mission and philosophy of NCCC.  Id. ¶ 11.

On May 16, 2005, the Board unanimously approved Brown's decision to terminate Anthoine based on his longstanding and recent failures with communication, following directions, and promoting his own personal views over the philosophy of NCCC. Defs.' UMF ¶¶ 74-75, 77.  On May 20, 2005, NCCC notified Anthoine that his termination was effective May 26, 2005, due to unsatisfactory performance, insubordination, and discourteous treatment of the public or other employees.  Id. ¶ 78.  In a letter dated May 25, 2005, Anthoine's attorney requested reconsideration of the disciplinary action taken against Anthoine as well the decision to terminate his employment.  Id. ¶ 85.  In a letter dated May 26, 2005, Anthoine's attorney advised Freeman that Anthoine was appealing the Board's decision to deny his formal grievance and to terminate his employment. Id. ¶ 86.  NCCC and Anthoine subsequently agreed to submit the following issues to arbitration: (1) whether the Board properly denied Anthoine's grievance; and (2) whether Anthoine's termination was appropriate under NCCC's personnel rules.  Id. ¶ 87.  On March 17, 2006, NCCC and Anthoine mutually agreed to end the arbitration proceedings so that Anthoine could pursue his claims in court.  Id. ¶ 88.  On May 30, 2006, Anthoine filed the instant action against Defendants alleging civil rights

violations and state law claims.  Docket at 1.  On February 22,
2008, Defendants filed a motion for summary judgment.  Docket at
30.  On March 13, 2008, Anthoine filed an opposition.  Docket at
49.[3]

II. OPINION

A.    Legal Standard

        Summary judgment is appropriate if "the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(c).  The moving party bears the initial burden of
demonstrating the absence of a genuine issue of material fact.
See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where
the nonmoving party will have the burden of proof on an issue at
trial, the movant's burden may be discharged by pointing out to
the district court that there is an absence of evidence to
support the nonmoving party's case.   See id. at 325; Miller v.
Glenn Miller Productions, Inc., 454 F.3d 975, 987 (9th Cir.
2006).  "Summary judgment for a defendant is appropriate when
the plaintiff fails to make a showing sufficient to establish

_____

        [3] As an initial matter, the Court notes that Anthoine, in
his opposition to Defendants' motion for summary judgment,
expressed his desire to withdraw his intentional and negligent
infliction of emotional distress claims; therefore, Anthoine's
Seventh and Eighth claims for relief are DISMISSED.

11

the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial." <u>Miller</u>, 454 F.3d at 987 (internal quotation marks omitted).

If the moving party sustains its burden, the burden then shifts to the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. <u>See</u> <u>Celotex</u>, 477 U.S. at 324 (citing Fed.R.Civ.P. 56(e)); <u>Miller</u>, 454 F.3d at 987. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." <u>Nissan Fire</u> <u>& Marine Ins. Co. v. Fritz Companies, Inc.</u>, 210 F.3d 1099, 1103 (9th Cir. 2000). Summary judgment is proper if, viewing the evidence and the inferences therefrom in the light most favorable to the nonmoving party, there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. <u>Valandingham v. Bojorquez</u>, 866 F.2d 1135, 1137 (9th Cir. 1989).

B.    <u>First Claim: Free Speech Retaliation</u>

Defendants argue that summary adjudication is appropriate with respect to Anthoine's First Amendment retaliation claim because Anthoine did not engage in constitutionally protected

speech, nor was the relevant speech a "substantial" or "motivating" factor in his termination.

Public employees suffer a constitutional violation when they are wrongfully terminated or disciplined for making protected speech.  <u>Marable v. Nitchman</u>, 511 F.3d 924, 929 (9th Cir. 2007) (citing <u>Pickering v. Board of Education</u>, 391 U.S. 563 (1968)).  "To state a First Amendment claim against a public employer, an employee must show: 1) the employee engaged in constitutionally protected speech; 2) the employer took adverse employment action against the employee; and 3) the employee's speech was a substantial or motivating factor for the adverse action."  <u>Marable</u>, 511 F.3d at 929 (internal quotation marks omitted).  To qualify as "constitutionally protected speech," the employee must have uttered the speech as a citizen, not an employee; because when public employees make statements pursuant to their official duties, those statements do not receive First Amendment protection.  <u>Marable</u>, 511 F.3d at 929 (citing <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2005)).  The question of whether speech is constitutionally protected is one of law, not fact. <u>Marable</u>, 511 F.3d at 930.

In the present case, Anthoine maintains that he was wrongfully disciplined and ultimately terminated in retaliation for engaging in constitutionally protected speech. Specifically, Anthoine asserts unconstitutional retaliation in

the form of the following discipline: (1) he was barred from exercising responsibilities commensurate with his knowledge and experience; (2) he was excluded from NCCC staff meetings and assigned menial tasks; (3) he was subject to unfounded criticism and disciplinary action; (4) he was graded as unsatisfactory in a job performance evaluation and required to prepare and comply with a job performance improvement plan; and (5) he was terminated.  Anthoine contends that Defendants wrongfully retaliated against him for informing Freeman that NCCC was in violation of its legal obligation to provide regularly updated client information to the state; and for informing Upward Bound staff that Upward Bound may be in violation of the WIA for using funds on college preparatory classes, and that use of funds for this purpose was unfair to other programs.  Anthoine maintains that this speech is protected by the First Amendment because it was made as a citizen involving a matter of public concern, namely the proper and efficient expenditure of public funds. The Court disagrees.

Anthoine's statements made to Freeman regarding NCCC's purported failure to provide updated client information to the state are not protected by the First Amendment.  This is so because Anthoine uttered the speech as an employee pursuant to his official duties, not as a private citizen speaking on a matter of public concern.  See Ceballos, 547 U.S. at 421-24

14

(holding that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline). Although Anthoine initiated his communications with Freeman outside of work, his speech was nonetheless uttered pursuant to the execution of his responsibilities and official duties at NCCC because, as a program analyst, he was charged with monitoring local workforce development programs for compliance with the WIA and for ensuring that NCCC satisfied its obligation to timely gather and report the services being provided by workforce development programs to state and federal agencies administering the WIA.  Moreover, it is undisputed that Anthoine was assigned the task of processing a backlog of case management reporting data to the state in early January 2005, and that it was during the execution of these duties that he discovered NCCC was in violation of its legal obligation to provide regularly updated client information to the state.  Thus, to the extent that Anthoine's conversation with Freeman involved a complaint about a supervisor's alleged misconduct in connection with NCCC's duty to report client data to the state, this speech is not constitutionally protected because it owed its existence to Anthoine's professional responsibilities, that is, the speech is not protected by the First Amendment because it was related to

activities that Anthoine undertook in a professional capacity to further NCCC's objectives, and was uttered as an employee pursuant to his official responsibilities, not while acting as a private citizen.   See Ceballos, 547 U.S. at 421-22 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.  It simply reflects the exercise of employer control over what the employer itself has commissioned or created."); see also Freitag v. Ayers, 468 F.3d 528, 546 (9th Cir. 2006) (internal complaints about supervisory failures or workplace mismanagement are consistent with the type of activities the employee is professionally obligated to perform); Hong v. Grant, 516 F.Supp.2d 1158, 1166 (C.D. Cal. 2007) (an employee's official duties are construed broadly to include those activities that an employee undertakes in a professional capacity to further the employer's objectives).  Accordingly, because Anthoine's statements in this regard indicate that he was fulfilling a professional obligation, and not acting as a private citizen, the statements are not constitutionally protected.[4]

---

[4] Because Anthoine does not argue that any of the other statements he made to Freeman during the January 2005 meeting qualify as protected speech under the First Amendment, the Court treats any First Amendment retaliation claim based thereon as abandoned.

Anthoine's statements to Upward Bound staff members
concerning Upward Bound's use of funds for college preparatory
classes are also not constitutionally protected because they
were made pursuant to Anthoine's official duties.  It is
undisputed that Anthoine was assigned to monitor the Upward
Bound program on behalf of NCCC (which included, among other
things, ensuring compliance with the WIA and providing
assistance and technical guidance to support Upward Bound's
success), and that Anthoine told Upward Bound staff that the
funds allocated to college preparatory classes may be in
violation of the WIA.  Indeed, Anthoine concedes that he was
exercising his duty to provide monitoring guidance to Upward
Bound when he told Upward Bound staff members that he
interpreted the WIA regulations to prohibit the payment of funds
to students for attending college preparatory classes.  It is
also undisputed that Anthoine told Upward Bound staff members
that, in his opinion, Upward Bound's use of funds for college
preparatory classes was unfair to other programs because the
intent of the WIA is to provide funds for work experience to
disadvantaged youth who do not plan on attending college.  Thus,
while Anthoine's official duties did not include assessing
whether a particular program's use of funds was fair to other
programs, his duties did include monitoring the use of funds by
programs for compliance with the WIA and to provide assistance

and technical guidance to support program success.  As such,
Anthoine's opinion as to the propriety of Upward Bound's
allocation of funds owes its existence to his professional
responsibilities as a program analyst for NCCC insofar as it was
related to activities that Anthoine undertook in a professional
capacity to further NCCC's objectives, and was uttered pursuant
to his official duties while acting within the scope of his
employment, not while acting as a private citizen.  See
Ceballos, 547 U.S. at 421-23; see also Brammer-Hoelter v. Twin
Peaks Charter Academy, 492 F.3d 1192, 1203 (10th Cir. 2007) (if
an employee engages in speech during the course of performing an
official duty and the speech reasonably contributes to or
facilitates the employee's performance of the official duty, the
speech is made pursuant to the employee's official duties).
Because these statements were made during the course of
Anthoine's daily professional activities and were related to
official duties that he was charged with performing, his
supervisors had the authority to take the proper corrective
action if they believed the statements to be inflammatory or
misguided because supervisors have an interest in ensuring that
official communications are accurate, demonstrate sound
judgment, and promote the employer's mission.  See Ceballos, 547
U.S. at 422-24 (the First Amendment does not prohibit managerial
discipline based on an employee's expressions made pursuant to

official responsibilities).  Accordingly, Anthoine's statements
to Upward Bound staff members are not constitutionally
protected, and therefore he has no First Amendment claim based
on Defendants' reaction to it.

Because the Court concludes that Anthoine did not speak as
a citizen with regard to the speech at issue, the Court need not
reach the remaining factors to establish a First Amendment
retaliation claim.  Absent protected speech, there is no
cognizable retaliation claim.  Accordingly, summary adjudication
is granted in favor of Defendants on Anthoine's First Amendment
retaliation claim.

C.   Second Claim: Gender Discrimination

Defendants argue that summary adjudication is appropriate
with respect to Anthoine's gender discrimination claim because:
(1) there is no evidence of discriminatory intent; (2)
Defendants had legitimate, nondiscriminatory reasons for their
actions; and (3) Anthoine cannot show any evidence of pretext.

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973),
the United States Supreme Court articulated a three-part test
for assessing the burdens and order of proof in a Title VII case
alleging discriminatory treatment.  First, the plaintiff has the
burden of proving by a preponderance of the evidence a prima
facie case of discrimination.  Id. at 802.  Second, if the
plaintiff succeeds in demonstrating a prima facie case, the

burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." <u>Id.</u> Third, should the defendant carry this burden, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination. <u>Id.</u> at 804.  To establish pretext, a plaintiff may do so by directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d 1217, 1220 (9th Cir. 1998).  A plaintiff may sustain their burden to show pretext by using either direct or circumstantial evidence.  <u>Coghlan v. American Seafoods Co. LLC.</u>, 413 F.3d 1090, 1094-95 (9th Cir. 2005).  When the plaintiff relies on circumstantial evidence, that evidence must be "specific and substantial" to avoid summary judgment.  <u>Id.</u> at 1095.

     In the present case, Anthoine relies exclusively on circumstantial evidence to establish a prima facie case of gender discrimination.  In this regard, Anthoine offers the following evidence: (1) his testimony that Brown's tone of voice and non-verbal behavior was noticeably more positive when she engaged with female employees as opposed to male employees; (2) documentary evidence that two female employees received higher

performance evaluation grades than all three NCCC male employees for the 2004 performance evaluation grading period; and (3) documentary evidence that all three male NCCC employees were terminated on the same day.  Even assuming for the sake of argument that Anthoine produced sufficient evidence to establish a prima facie case of gender discrimination, Defendants have articulated legitimate nondiscriminatory reasons for the various complained of conduct.  Anthoine maintains that the evidence he produced in response to Defendants' motion for summary judgment is sufficient to raise a triable issue of material fact as to whether his verbal reprimand (for his comments made to Upward Bound staff) and his subsequent termination were "falsely overblown and hence pretextual."[5]  Specifically, Anthoine argues that Brown and Newton, acting out of gender bias, exaggerated his behavior during his monitoring appointment with Upward Bound to create the justification for his termination.  The Court finds, however, that Anthoine failed to sustain his burden to produce specific, substantial evidence raising a triable issue of material fact on the question of whether Defendants' stated reasons for his verbal reprimand and subsequent termination were

---

[5] To the extent that Anthoine failed to respond to the nondiscriminatory reasons proffered by Defendants for the other complained of conduct in which Anthoine alleges was motivated by gender discrimination, the Court will treat Anthoine's failure in this regard as an abandonment of his contention that such conduct constituted illegal gender discrimination.

really a pretext for illegal gender discrimination.  The undisputed facts demonstrate that Anthoine had a long history of performance issues, including an inability or unwillingness to follow directions and the philosophy of NCCC.  It is also undisputed that, despite being warned in writing by Newton in February 2005 to refrain from taking action that is not approved by his supervisor, and despite knowing that both Newton and Brown did not agree with his assessment that Upward Bound's use of funds for college preparatory classes violated the WIA, Anthoine nonetheless told Upward Bound staff members that Upward Bound's use of funds for this purpose may be in violation of the WIA.  In short, the Court finds Defendants' articulated nondiscriminatory reasons for Anthoine's termination to be credible.

Additionally, the Court finds that Anthoine did not sustain his burden to produce specific, substantial evidence demonstrating that a discriminatory reason more likely motivated his termination rather than the reasons proffered by Defendants. In this regard, Anthoine did not produce meaningful evidence raising a triable issue of material fact on the question of whether Defendants were biased or harbored discriminatory animus insofar as the evidence produced by Anthoine has little direct bearing on the specific intentions of Defendants in terminating him.  See Aragon v. Republic Silver State Disposal Inc., 292

F.3d 654, 663 (9th Cir. 2002) (noting that in disparate
treatment cases, statistical evidence (such as evidence that
four out of five people laid off (out of 28 total employees)
were African American), in and of itself, rarely suffices to
rebut an employer's legitimate, nondiscriminatory rationale for
its decision to dismiss an individual employee because a
company's overall employment statistics generally have little
direct bearing on the specific intentions of the employer when
dismissing a particular individual).  Anthoine's statistical
evidence does not show a stark pattern of discrimination
unexplainable on grounds other than gender.  It also does not
account for possible nondiscriminatory variables,[6] such as job
performance.  Because such evidence is not supported by other
probative evidence of illegal discrimination, the Court
concludes that this evidence falls short of constituting
substantial and specific evidence of illegal gender
discrimination.  See id. at 663-64.  Anthoine, for instance, did
not point to evidence indicating that the 2004 employee
performance evaluations were based on anything other than job

---

[6] Interestingly, although Defendants did not proffer NCCC's
reorganization and downsizing as a legitimate nondiscriminatory
reason for Anthoine's termination, Anthoine concedes that NCCC's
reorganization and downsizing were significant contributing
factors in his termination.  Defs.' UMF ¶¶ 115-116. In fact,
Anthoine acknowledges that Brown sought to eliminate the
positions occupied by the other two male NCCC employees as part
of a plan to reorganize NCCC.

performance.   Nor does the Court find Anthoine's belief that

Brown's tone of voice and nonverbal behavior was noticeably more

positive when she engaged with female employees to be

substantial and specific evidence of illegal gender

discrimination demonstrating that there is a genuine issue for

trial.   See Rodriguez v. International Business Machines, 960

F.Supp. 227, 231 (N.D. Cal. 1997) (a plaintiff's subjective

belief that his employers actions were discriminatorily

motivated is not sufficient to withstand summary judgment).   In

sum, the evidence offered by Anthoine does not undermine the

reasons proffered by Defendants for his termination, nor is it

sufficient evidence to indicate that either Brown or Newton

harbored discriminatory animus toward men in general or Anthoine

in particular.   Accordingly, because Anthoine did not

demonstrate that the Defendants legitimate, nondiscriminatory

reasons for his termination were a pretext for illegal gender

discrimination, summary adjudication is granted in favor of

Defendants on Anthoine's gender discrimination claim.

D.    Third Claim: Violation of Procedural Due Process

        Defendants argue that summary adjudication is appropriate

with respect to Anthoine's due process property interest claim

because Anthoine did not have a protected property interest in

continued employment with NCCC and because Anthoine was provided

a proper opportunity to be heard prior to his termination.

Additionally, Defendants argue that summary adjudication is appropriate with respect to Anthoine's due process liberty interest claim because Defendants did not publish false, stigmatizing statements in connection with Anthoine's termination.

The procedural due process component of the Fourteenth Amendment protects individuals against the deprivation of liberty or property by the government without due process.  "A section 1983 claim based upon procedural due process . . . has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process." <u>Portman v. County of Santa Clara</u>, 995 F.2d 898, 904 (9th Cir. 1993).  The essential requirements of due process are notice and an opportunity to respond, i.e., opportunity to present reasons, either in person or in writing, why proposed action should not be taken. <u>Cleveland Board of Education v. Loudermill</u>, 470 U.S. 532, 546 (1985).  However, an individual is only entitled to procedural due process if he was deprived of a protected property or liberty interest.  See <u>Clements v. Airport Authority of Washoe County</u>, 69 F.3d 321, 331 (9th Cir. 1995).

A government employee has a constitutionally protected property interest in continued employment when the employee has a legitimate claim of entitlement to the job.  <u>Portman</u>, 995 F.2d

at 904 (citing <u>Board of Regents v. Roth</u>, 408 U.S. 564, 577 (1972)).  Laws, rules or understandings derived from independent sources such as state law create such claims of entitlement. <u>Portman</u>, 995 F.2d at 904.  The existence of an entitlement amounting to a property right may be established through agreement, express or implied, limiting the public employer's right to dismiss absent sufficient cause.  <u>Figueroa v. Housing Authority</u>, 131 Cal.App.3d 528, 532 (1982).  If an employee is subject to discharge only for cause, then the claimant has a property interest which is entitled to constitutional protection.  <u>Id.</u>  However, a mere expectation that employment will continue does not create a property interest.  <u>Portman</u>, 995 F.2d at 904.  Thus, if under state law, employment is at-will, then the claimant has no property interest in the job.  <u>Id.</u>

    "The liberty interest protected by the due process clause encompasses an individual's freedom to work and earn a living." <u>Portman</u>, 995 F.2d at 907 (internal quotation marks omitted). "[W]hen the government dismisses an individual for reasons that might seriously damage his standing in the community, he is entitled to notice and a hearing to clear his name."  <u>Id.</u> (internal quotation marks omitted).  However, in order to implicate constitutional liberty interests, the reasons for dismissal must be sufficiently serious to "stigmatize" or otherwise burden the individual so that he is not able to take

advantage of other employment opportunities.  <u>Id.</u>  Injury to
reputation standing alone does not violate the Due Process
Clause of the Fourteenth Amendment.  <u>Wenger v. Monroe</u>, 282 F.3d
1068, 1074 (9th Cir. 2002).  Rather, due process protections
apply only if a plaintiff is subjected to "stigma plus," i.e.,
if the government makes a charge against a plaintiff that might
seriously damage his standing and associations in the community,
and (1) the accuracy of the charge is contested, (2) there is
some public disclosure of the charge, and (3) it is made in
connection with the termination of employment or the alteration
of some right or status recognized by state law.  <u>Id.</u>  A
government employee is entitled to a name-clearing hearing "if
the employer creates and disseminates a false and defamatory
impression about the employee in connection with his
termination."  <u>Brady v. Gebbie</u>, 859 F.2d 1543, 1553 (9th Cir.
1988) (internal quotation marks omitted).

     1. <u>Due Process Violation Premised on Protected Property
       Interest</u>

     Anthoine maintains that Defendants deprived him of a
constitutionally protected property interest in continued
employment by terminating him without providing an opportunity
to contest the charges in a pre-termination hearing.  To support
this claim, Anthoine did not point to a statute, rule or policy
giving him a property interest in continued employment; rather,

he points to a provision of NCCC's personnel rules ostensibly for the purpose of demonstrating that NCCC had a policy of corrective discipline, and that such a policy is inconsistent with a policy of at-will employment.  In other words, Anthoine points to the provision for the purpose of demonstrating that he was only terminable for cause.  Anthoine's argument is misplaced and unpersuasive.

This provision, titled, "Employee Discipline Procedures," sets forth the purpose and reasons for taking disciplinary action against employees as well as the steps and procedures to be followed in disciplining an employee.  This provision states, in relevant part, that "the purpose of disciplinary action is to improve employee performance" and that "[d]isciplinary actions are corrective and progressive in nature."  The Court finds this evidence, standing alone, insufficient to avoid summary judgment because it does not establish a triable issue of material fact as to whether Anthoine was only terminable for cause, that is, it does not demonstrate that Anthoine had a property interest which is entitled to constitutional protection.  See Davis v. Consolidated Freightways, 29 Cal.App.4th 354, 367 (1994) (the use of a "progressive discipline" policy does not rebut the presumption of at-will employment).  Moreover, the Court finds that this claim does not survive summary judgment because the undisputed facts demonstrate that NCCC complied with procedural

due process requirements insofar as it provided Anthoine proper notice of the charges, an explanation of the evidence, and an opportunity to be heard prior to termination.  <u>See</u> <u>Clements</u>, 69 F.3d at 331 (Under a due process analysis, plaintiff must receive notice and an opportunity to be heard "before he is deprived of any significant property interest.").  An "elaborate" pre-termination hearing is not required; rather, only "some kind of hearing" must be afforded the employee prior to termination.  <u>Id.</u> at 332.  "The essential requirements of this pre-termination process are *notice* and *an opportunity to respond.*"  <u>Id.</u> (emphasis in original).  Here, it is undisputed that Anthoine received notice of his termination, in writing, from Brown on May, 20 2005, outlining the reasons for his termination.  It is also undisputed that this notice expressly advised Anthoine that he had the right to respond to the charges against him prior to the effective date of his termination by contacting the Interim Director of NCCC and/or by appealing the decision to the Board.  Anthoine does not dispute receiving this letter, nor its contents.  Thus, the notice requirement was met.

As to whether Anthoine received the requisite meaningful opportunity to respond, it is undisputed that Anthoine requested a hearing before the Board on May 25, 2005, and that on May 26, 2005, the parties mutually agreed to forego the hearing before the Board so they could arbitrate, among other things, whether

Anthoine's termination was appropriate under NCCC's personnel rules.  Based on the foregoing, the Court finds that Anthoine was afforded a sufficient opportunity to be heard prior to his termination to satisfy constitutional due process requirements.  The fact that Anthoine chose to arbitrate the propriety of his termination rather than present his case to the Board does not make the process afforded to him constitutionally deficient.  Accordingly, summary adjudication is granted in favor of Defendants on Anthoine's due process protected property interest claim.

>        2. <u>Due Process Violation Premised on Protected Liberty Interest</u>

Anthoine maintains that Defendants deprived him of a constitutionally protected liberty interest by publishing false reasons for his termination without providing a pre-termination name clearing hearing.  The Court disagrees.  The undisputed evidence demonstrates that the reasons for Anthoine's dismissal (e.g., unsatisfactory performance, insubordination, and discourteous treatment of the public or other employees) were not sufficiently serious to "stigmatize" or otherwise burden Anthoine such that he is unable to take advantage of other employment opportunities.  <u>See</u> <u>Portman</u>, 995 F.2d at 907 ("Charges that carry the stigma of moral turpitude such as dishonesty or immorality may implicate a liberty interest, but

charges of incompetence or inability to get along with others do not.") (internal quotation marks omitted); <u>see</u> <u>also</u> <u>Gray v. Union County Intermediate Educ. Dist.</u>, 520 F.2d 803, 806 (9th Cir. 1975) (charges of "insubordination, incompetence, hostility toward authority, and aggressive behavior" are insufficiently stigmatizing to implicate a constitutional liberty interest). Here, none of the stated reasons for Anthoine's termination implicate a liberty interest.  The record in this case reflects that the charges against Anthoine focus on his inability to perform his job satisfactorily, follow directions and treat people courteously, not on dishonesty or moral turpitude.  As such, the charges do not infringe on a liberty interest. Accordingly, because the charges against Anthoine do not implicate a liberty interest, and because Antoine was provided an opportunity to be heard prior to his termination, summary adjudication is granted in favor of Defendants on Anthoine's due process protected liberty interest claim.

E.   <u>Fourth and Fifth Claims: Wrongful Discharge in Violation of Public Policy</u>

Defendants argue that summary adjudication is appropriate with respect to Anthoine's wrongful discharge in violation of

public policy claims because Anthoine was not terminated based on free speech retaliation or sex discrimination.[7]

Under California law an employer may be held liable for wrongful termination if it discharges an employee in contravention of fundamental public policy.  Tameny v. Atlantic Richfield Co., 27 Cal.3d 167, 177 (1980); Green v. Ralee Engineering Company, 19 Cal.4th 66 (1998).  To establish a claim of wrongful discharge in violation of public policy under California law, plaintiff must show: (1) that she was terminated from her employment; (2) that the termination was a violation of public policy, i.e., that there was a nexus between the termination and the plaintiff's status or protected activity; and (3) damages.  Turner v. Anheuser-Busch, Inc., 7 Cal.4th 1238, 1258-59 (1994).  Tort claims for wrongful discharge typically arise when an employer retaliates against an employee for "(1) refusing to violate a statute, (2) performing a statutory obligation, (3) exercising a statutory right or

---

[7] As an initial matter, the Court notes that Anthoine's Fourth and Fifth claims for relief can only be brought against NCCC.  Under California law, it is well established that only an employer can be liable for the tort of wrongful discharge in violation of public policy.  Khajavi v. Feather River Anesthesia Medical Group, 84 Cal.App.4th 32, 53 (2000).  Accordingly, to the extent that Anthoine seeks to bring such claims against Newton and Brown, the Court grants summary adjudication in their favor.

privilege, or (4) reporting an alleged violation of a statute of public importance."  Id. at 1256 (citations omitted).

    1. <u>Wrongful Discharge Premised on Violation of California Constitution and WIA</u>

    Anthoine's Fourth claim for relief seeks to state a claim for wrongful discharge in violation of fundamental public policies, namely the free speech clause of the California Constitution and the policies embedded in the WIA. Specifically, Anthoine claims he was retaliated against for complaining about violations of the WIA.  However, as discussed above, because Anthoine did not demonstrate that the speech in question is constitutionally protected under the First Amendment, he cannot establish that he was wrongfully terminated in contravention of a fundamental policy of the California Constitution.  With respect to Anthoine's claim that he was wrongfully discharged in violation of the public policies embedded in the WIA, the Court finds that Anthoine failed to establish a genuine issue for trial with regard to this claim. Anthoine did not identify the specific provisions of the WIA that would be violated by his termination.  Anthoine's vague charge that the speech at issue is protected by the policies embedded in the WIA puts the Court in the position of having to guess the nature of the public policies involved in this claim. This kind of showing is insufficient to create a triable issue

of fact justifying a trial.  See Turner, 7 Cal.4th at 1256-57.

Accordingly, summary adjudication is granted in favor of

Defendants on Anthoine's wrongful discharge in violation of

public policy claim premised upon the free speech clause of the

California Constitution and the policies embedded in the WIA.

    2. Wrongful Discharge Premised on FEHA Violation

    Anthoine's Fifth claim for relief seeks to state a claim

for wrongful discharge in violation of the public policies

embedded in Government Code §§ 12940 et seq., the California

Fair Employment and Housing Act ("FEHA"), which forbids

employers from discriminating against employees on the basis of

gender.  However, for the reasons discussed above, because

Anthoine failed to establish that Defendants' legitimate non-

discriminatory reasons for his termination were not pre-textual,

and therefore failed to establish a meritorious gender

discrimination claim, Anthoine similarly cannot establish a

violation of FEHA.  See Brooks v. City of San Mateo, 229 F.3d

917, 923 (9th Cir. 2000) (California courts apply the McDonnell

Douglas burden shifting approach to claims brought pursuant to

FEHA and apply the same guiding legal principles).  In other

words, because Anthoine did not show that he was wrongfully

terminated based on gender discrimination, he cannot show that

he was wrongfully terminated based on a violation of the public

policies embedded in FEHA.  See Esberg v. Union Oil Co., 28

Cal.4th 262, 272 (2002) (failure to establish a violation of FEHA is fatal claim to a claim for wrongful termination in violation of public policy based on FEHA).  Accordingly, summary adjudication is granted in favor of Defendants on Anthoine's wrongful discharge in violation of public policy claim premised on FEHA.

F.   <u>Sixth Claim: Defamation</u>

Defendants argue that summary adjudication is appropriate with respect to Anthoine's defamation claim because Defendants did not publish any defamatory statements about Anthoine, and because Anthoine was not strongly compelled to publish statements regarding his termination.  The Court agrees.

"Defamation is an invasion of the interest in reputation. The tort involves the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage."  <u>Ringler Associates Inc. v. Maryland Cas. Co.</u>, 80 Cal.App.4th 1165, 1179 (2000). "Publication, which may be written or oral, is defined as a communication to some third person who understands both the defamatory meaning of the statement and its application to the person to whom reference is made."  <u>Id.</u>  Publication to a single individual is sufficient to satisfy the publication element of a defamation claim.  <u>Id.</u>  In all cases of alleged defamation the truth of the offensive statements or communication is a complete

defense against civil liability, regardless of bad faith or malicious purpose.  Id. at 1180.

Generally, when a defamed person voluntarily repeats a libelous communication to others, the originator of the defamatory statement is not liable for any ensuing damage. McKinney v. County of Santa Clara, 110 Cal.App.3d 787, 796 (1980).  However, there is an exception to this rule "where the originator of the defamatory statement has reason to believe that the person defamed will be under a strong compulsion to disclose the contents of the defamatory statement to a third person."  Id.  A "strong compulsion" may exist when a job seeker must tell a prospective employer the reasons he was terminated in order to explain away a negative job reference from his former employer.  Live Oak Publishing Co. v. Cohagan, 234 Cal.App.3d 1277, 1287 (1991); see also Davis, 29 Cal.App.4th at 373 (Self-publication of alleged defamatory statements may be imputed to the originator of the statement if the person defamed is operating under a strong compulsion to republish the defamatory statement, such as if a job seeker must tell a prospective employer what is in his personnel file in order to explain away a negative job reference.).

In the present case, Anthoine does not argue that Defendants published the reasons for his termination to any third party; rather, he argues that he self-published the

alleged defamatory statements to prospective employers because he felt "strongly compelled" to explain the reasons for his termination.   However, because Anthoine failed to show that NCCC ever gave him a negative job reference, or that he had reason to believe they would do so, the Court finds that Anthoine failed to raise a triable issue of material fact as to whether he was "strongly compelled" to publish the allegedly defamatory statements such that the publication may be imputed to NCCC. Accordingly, summary adjudication is granted in favor of Defendants on Anthoine's defamation claim.

G.     Rule 56(f)

     Anthoine requests a continuance pursuant to Rule 56(f) because he was unable to secure the declaration of a witness he failed to depose.

     A party requesting a continuance pursuant to Rule 56(f) must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment.   Tatum v. City and County of San Francisco, 441 F.3d 1090, 1100 (9th Cir. 2006) (citing Fed.R.Civ.P. 56(f)).   Failure to comply with the requirements of Rule 56(f) is a proper ground for denying discovery and proceeding to summary judgment.   See Weinberg v. Whatcom County, 241 F.3d 746, 751 (9th Cir. 2001).   The burden is on the party seeking additional discovery to proffer sufficient facts to show

that the evidence sought exists, and that it would prevent

summary judgment.  <u>Chance v. Pac-Tel Teletrac Inc.</u>, 242 F.3d

1151, 1161 n. 6 (9th Cir. 2001).  The district court does not

abuse its discretion by denying further discovery if the movant

has failed to diligently pursue discovery in the past.  <u>Id.</u>

In the present case, Anthoine requested a continuance

pursuant to Rule 56(f) in his opposition to summary judgment.

The Court finds this request plainly inadequate to justify a

continuance.  <u>See Weinberg</u>, 241 F.3d at 751 (references in

memoranda and declarations to a need for discovery do not

qualify as motions under Rule 56(f)).  Moreover, even assuming

that Anthoine's request for a continuance was not procedurally

deficient, the Court nonetheless finds that Anthoine failed to

sustain his burden to justify a continuance because he neither

identified by affidavit the specific facts that further

discovery would have revealed, nor did he explain why those

facts would have precluded summary judgment.  Nor did Anthoine

///

///

///

///

///

///

adequately demonstrate that he diligently pursued his previous discovery opportunities.  Accordingly, Anthoine's request for a continuance pursuant to Rule 56(f) is denied.[8]


                                III. ORDER

     For the reasons set forth above, Defendants' motion for summary judgment is GRANTED.  The Clerk of the Court is directed to enter judgment in this matter in accordance with this Order.

     IT IS SO ORDERED.

Dated:  July 8, 2008

                              _____
                              JOHN A. MENDEZ,
                              UNITED STATES DISTRICT JUDGE

----

     [8] In light of the foregoing, the Court finds it unnecessary to consider Defendants' objections to evidence submitted by Anthoine in support of his opposition to Defendants' motion for summary judgment.  Docket at 53.