IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NELSON H. ANTHOINE,

       Plaintiff,

    v.

NORTH CENTRAL COUNTIES
CONSORTIUM; LORI BROWN; and
CINDY NEWTON,

       Defendants.

_____/

No. 2:06-CV-01169 JAM KJM

AMENDED ORDER GRANTING
MOTION FOR SUMMARY JUDGMENT

Nelson H. Anthoine ("Anthoine") brought this action against his former employer North Central Counties Consortium ("NCCC"), Lori Brown ("Brown") and Cindy Newton ("Newton") (collectively "Defendants") alleging civil rights violations and state law claims arising out of his termination.  Defendants now move for summary judgment or, in the alternative, summary adjudication pursuant to Rule 56 of the Federal Rules of Civil Procedure.

1

Anthoine opposes the motion.  For the reasons set forth below, Defendants' motion is GRANTED.[1]

## I. UNDISPUTED FACTS

Defendant NCCC is a public entity created by an agreement between Colusa County, Glen County, Lake County, Sutter County and Yuba County for the purpose of providing state and federal funds through the Workforce Investment Act ("WIA") to agencies providing job training services to businesses and jobseekers. Defs.' Undisputed Material Facts ("UMF") ¶¶ 1-3.  NCCC is governed by a Board consisting of one county supervisor from each member county.  Id. ¶ 5.  NCCC works with agencies to ensure compliance with the WIA and seeks to provide monitoring that supports program success by providing assistance and technical guidance.  Id. ¶ 4.

Defendant Brown was an independent consultant hired by NCCC to accomplish various tasks from 2001 to 2004, including conducting a re-classification study, meeting facilitation for NCCC leadership, strategic planning, developing policies and procedures, staff training and human resources support.  Defs.' UMF ¶ 7.  In 2005, NCCC hired Brown to serve as interim executive director of NCCC, a capacity in which she served from

---

[1] Because oral argument will not be of material assistance, the Court orders this matter submitted on the briefs.  E.D. Cal. L.R. 78-230(h).

January 27, 2005 to December 31, 2005.  Id. ¶ 9.  Defendant

Newton was a senior program analyst at NCCC responsible for

supervising NCCC's program monitoring efforts, including program

analysts.  Id. ¶ 10.  Plaintiff Anthoine was a program analyst

at NCCC from 1988 until his termination in May 2005.  Id. ¶¶ 11,

78.  One of Anthoine's principal duties as a program analyst was

to monitor local workforce development programs for compliance

with the WIA.  Compl. ¶ 7.  Specifically, from February 2004,

until his discharge on May 26, 2005, Anthoine monitored Upward

Bound, a workforce development program operated by the

California State University at Chico.  Defs.' UMF ¶ 56.

In 1990, 1993, 1994, 1996, 1998, and 2000, Anthoine was

graded by supervisors as, among other things, weak in complying

with instructions.  Defs.' UMF ¶¶ 14-17, 19, 21.  Several times

over this same period, Anthoine was also graded as unwilling to

accept or follow the philosophy of NCCC.  Id. ¶¶ 15, 19, 21.  In

particular, in 1998, in response to a project Anthoine was

unable to complete, Anthoine received a memo from NCCC's deputy

executive director, Bill Rottman ("Rottman"), stating: "It is

considered insubordinate by this office for you to hinder work

in progress as a result of your personal views of an issue or

procedure.  It is certainly inappropriate and unacceptable

conduct."  Id. ¶ 18.  On March 25, 2002, Newton warned Anthoine

that his failure to complete a particular assignment in a timely

manner was unacceptable and that future issues related to unacceptable work performance could result in disciplinary action.  Id. ¶ 22; Newton Decl., Exh. J.  Sometime later, Anthoine was reassigned from monitoring duties and worked primarily from home thereafter.  Defs.' UMF ¶ 23.

In February 2004, Anthoine returned to monitoring duties at NCCC.  Defs.' UMF ¶ 23.  In October 2004, Newton informed Anthoine that several events between June and October of 2004 caused her to conclude that he had developed a pattern of not following directions and warned him that any further behavior in this regard could result in disciplinary action.  Id. ¶ 24.  In early January 2005, Anthoine was assigned the task of processing a backlog of case management reporting data (client data) for submission to the state.  Id. ¶ 38.  In late January 2005, Anthoine arranged a meeting with the chairman of NCCC's governing Board, Gary Freeman ("Freeman"), to discuss the following issues: the problem with NCCC's case management reporting system, Newton's statement to the Board claiming that NCCC was current in its obligation to provide client data to the state, the potential litigation related to the case management reporting system, Rottman filling the executive director position, and Rottman ignoring his concerns that his work was not being considered properly.  Id. ¶ 26.  According to Anthoine, he arranged this meeting to "discuss several highly

4

important matters involving the overall direction and future of NCCC" and to raise his policy disagreements with Newton and higher managers.  Anthoine Decl. ¶ 7.  In particular, Anthoine asserts that he met with Freeman to inform him that, contrary to Newton's statements to the Board, NCCC was not current in its obligation to report client data to the state.  Id.  Anthoine maintains that he told Freeman this information not only because of its bearing on NCCC's obligation to the state, but also because it could impact the viability of any litigation launched by NCCC against Softscape, the company which provided NCCC with software that automated the gathering and uploading of client data to the state.  Id.  According to Anthoine, the delay in submitting client data to the state was due to the functional failure of Softscape's software. Id.

Following this meeting, Freeman spoke to Brown about Newton's statements to the Board regarding the submission of client data to the state.  Defs.' UMF ¶¶ 29, 31.  Thereafter, Brown met with Anthoine to discuss this issue.  Id. ¶ 31.  After this meeting, Brown investigated Anthoine's concerns and concluded that a problem did in fact exist with the case management reporting system and relayed this information to Newton.  Id. ¶ 32.  Brown and Newton subsequently spoke about how to resolve this issue.  Id.

On February 5, 2005, Newton gave Anthoine a memo notifying him of disciplinary action based on a "pattern of insubordination."  Defs.' UMF ¶ 33.  The memo set forth five incidents of insubordination and warned Anthoine that he needed to follow his supervisor's directions and to refrain from taking action not approved by his supervisor.  Id. ¶¶ 33-34; Newton Decl., Exh. L.  Specifically, Newton's memo stated: "I have held discussions with you on two separate occasions regarding five incidents of insubordination, specifically through your failure to follow directions.  Additionally, your failure to follow directions has negatively impacted your work performance as well as that of your co-workers.  Unfortunately, this behavior has continued, and as such disciplinary action has now been deemed necessary."  Newton Decl., Exh. L.  The memo also warned Anthoine that "further incident of insubordination shall result in disciplinary action up to and possibly including termination."  Defs.' UMF ¶ 33.

On February 14, 2005, Anthoine submitted a written response to the disciplinary action.  Defs.' UMF ¶ 35.  On February 24, 2005, Brown met with Anthoine to discuss several issues including, Anthoine's response to the disciplinary action, his complaint regarding work assignments, and his request to revoke the disciplinary action.  Id. ¶ 36.  On February 25, 2005, Anthoine submitted a formal grievance regarding his work

assignments, the disciplinary action, and Newton's alleged practice of meeting with other program analysts without him. Id. ¶ 37.  On March 25, 2005, Brown sent Anthoine a memo denying his formal grievance.  Id. ¶ 39; Brown Decl., Exh. A.  In this memo, Brown explained to Anthoine that even if his personal philosophy differs from the philosophy of NCCC, he needs to be mindful of NCCC's goal, which is to provide monitoring that supports program success while ensuring quality through a high level of customer service and technical assistance.  Brown Decl., Exh. A.  On April 7, 2005, Anthoine appealed Brown's decision to the Board.  Defs.' UMF ¶ 42.  Following Anthoine's presentation of his case to the Board, which incidentally did not include a complaint of gender discrimination, the Board unanimously denied his grievance and specifically directed him to follow the communication and decision making protocols established by Newton and Brown.  Id. ¶¶ 44-49.  According to Board chairman Freeman, he voted to deny Anthoine's grievance because Brown had presented sufficient evidence of Anthoine's insubordination.  Id. ¶ 50.

On March 17, 2005, Anthoine received his 2004 performance evaluation, which graded him as "unsatisfactory" overall. Defs.' UMF ¶ 51.  The evaluation stated that Anthoine has "extreme difficulty following directions and taking supervision from his supervisor," and that his work "frequently must be

revised or redone by his supervisor or coworkers." Id. The evaluation further stated that Anthoine's work does not always reflect the philosophy of NCCC or a clear understanding of the needs of his internal and external customers. Id.

On April 20, 2005, Anthoine conducted a monitoring appointment with Upward Bound. Defs.' UMF ¶ 62. Prior to this appointment, Newton maintains that she directed Anthoine not to discuss his concerns about Upward Bound's use of WIA funds ("funds") for college preparatory classes until she received an answer from NCCC's state WIA liaison about whether Upward Bound's use of funds for this purpose was proper. Id. ¶¶ 57-58, 63.[2] Notwithstanding Newton's alleged directive, Anthoine, during the April 20, 2005 monitoring appointment, told Upward Bound staff members that Upward Bound's use of funds for college preparatory classes may not be allowable under the WIA and that Upward Bound may have to pay those funds back. Id. ¶ 64. Anthoine also told Upward Bound staff that, in his opinion, Upward Bound's use of funds for college preparatory classes was unfair to other programs. Id. Anthoine maintains that he

---

[2] Anthoine denies that Newton directed him not to express his concerns about Upward Bound's use of funds for college preparatory classes prior to the April 20, 2005 monitoring appointment. Anthoine, however, acknowledges that both Newton and Brown specifically told him that they did not believe that Upward Bound's use of funds for college preparatory classes violated the WIA. Defs.' UMF ¶ 59.

expressed his opinion in this regard because he wanted to influence NCCC management to make these funds available to other programs that emphasized bona-fide work-site experience for disadvantaged youth who do not plan on attending college.  Id. ¶ 65.  In Anthoine's opinion, Upward Bound's use of funds for college preparatory classes was inappropriate because it did not comport with the intent of the WIA, which is to support programs that assist disadvantaged youth in gaining work experience.  Id.

Following the monitoring appointment, two Upward Bound staff members contacted Newton and complained about Anthoine's statements regarding Upward Bound's use of funds for college preparatory classes.  Defs.' UMF ¶¶ 66, 68, 71.  On May 13, 2005, Newton informed Brown that she had directed Anthoine prior to the monitoring appointment not to discuss his concerns with Upward Bound staff about Upward Bound's use of funds for college preparatory classes.  Id. ¶ 70.  On May 19, 2005, Brown received the complaint statements made by the Upward Bound staff members.  Id. ¶ 71.  Thereafter, Brown decided to terminate Anthoine based on her belief that he was unwilling or unable to correct his performance issues, follow directions, promote NCCC's philosophy over his own, id. ¶ 72, and represent programs and services accurately.  Decl. of Brown ¶ 12.  According to Brown, she viewed the written complaint statements as a confirmation and continuation of Anthoine's pattern of knowingly and overtly

9

refusing to follow directions and promoting his own opinions over the mission and philosophy of NCCC.  Id. ¶ 11.

On May 16, 2005, the Board unanimously approved Brown's decision to terminate Anthoine based on his longstanding and recent failures with communication, following directions, and promoting his own personal views over the philosophy of NCCC. Defs.' UMF ¶¶ 74-75, 77.  On May 20, 2005, NCCC notified Anthoine that his termination was effective May 26, 2005, due to unsatisfactory performance, insubordination, and discourteous treatment of the public or other employees.  Id. ¶ 78.  In a letter dated May 25, 2005, Anthoine's attorney requested reconsideration of the disciplinary action taken against Anthoine as well the decision to terminate his employment.  Id. ¶ 85.  In a letter dated May 26, 2005, Anthoine's attorney advised Freeman that Anthoine was appealing the Board's decision to deny his formal grievance and to terminate his employment. Id. ¶ 86.  NCCC and Anthoine subsequently agreed to submit the following issues to arbitration: (1) whether the Board properly denied Anthoine's grievance; and (2) whether Anthoine's termination was appropriate under NCCC's personnel rules.  Id. ¶ 87.  On March 17, 2006, NCCC and Anthoine mutually agreed to end the arbitration proceedings so that Anthoine could pursue his claims in court.  Id. ¶ 88.  On May 30, 2006, Anthoine filed the instant action against Defendants alleging civil rights

violations and state law claims.  Docket at 1.  On February 22,
2008, Defendants filed a motion for summary judgment.  Docket at
30.  On March 13, 2008, Anthoine filed an opposition.  Docket at
49.[3]

II. OPINION

A.   Legal Standard

Summary judgment is appropriate if "the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(c).  The moving party bears the initial burden of
demonstrating the absence of a genuine issue of material fact.
See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where
the nonmoving party will have the burden of proof on an issue at
trial, the movant's burden may be discharged by pointing out to
the district court that there is an absence of evidence to
support the nonmoving party's case.  See id. at 325; Miller v.
Glenn Miller Productions, Inc., 454 F.3d 975, 987 (9th Cir.
2006).  "Summary judgment for a defendant is appropriate when
the plaintiff fails to make a showing sufficient to establish

_____

[3] As an initial matter, the Court notes that Anthoine, in
his opposition to Defendants' motion for summary judgment,
expressed his desire to withdraw his intentional and negligent
infliction of emotional distress claims; therefore, Anthoine's
Seventh and Eighth claims for relief are DISMISSED.

11

the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial." Miller, 454 F.3d at 987 (internal quotation marks omitted).

If the moving party sustains its burden, the burden then shifts to the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. See Celotex, 477 U.S. at 324 (citing Fed.R.Civ.P. 56(e)); Miller, 454 F.3d at 987. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1103 (9th Cir. 2000). Summary judgment is proper if, viewing the evidence and the inferences therefrom in the light most favorable to the nonmoving party, there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Valandingham v. Bojorquez, 866 F.2d 1135, 1137 (9th Cir. 1989).

B.   First Claim: Free Speech Retaliation

Defendants argue that summary adjudication is appropriate with respect to Anthoine's First Amendment retaliation claim because Anthoine did not engage in constitutionally protected

speech, nor was the relevant speech a "substantial" or "motivating" factor in his termination.

Public employees suffer a constitutional violation when they are wrongfully terminated or disciplined for making protected speech.  Marable v. Nitchman, 511 F.3d 924, 929 (9th Cir. 2007) (citing Pickering v. Board of Education, 391 U.S. 563 (1968)).  "To state a First Amendment claim against a public employer, an employee must show: 1) the employee engaged in constitutionally protected speech; 2) the employer took adverse employment action against the employee; and 3) the employee's speech was a substantial or motivating factor for the adverse action."  Marable, 511 F.3d at 929 (internal quotation marks omitted).  To qualify as "constitutionally protected speech," the employee must have uttered the speech as a citizen, not an employee; because when public employees make statements pursuant to their official duties, those statements do not receive First Amendment protection.  Marable, 511 F.3d at 929 (citing Garcetti v. Ceballos, 547 U.S. 410 (2005)).  The question of whether speech is constitutionally protected is one of law, not fact. Marable, 511 F.3d at 930.

In the present case, Anthoine maintains that he was wrongfully disciplined and ultimately terminated in retaliation for engaging in constitutionally protected speech. Specifically, Anthoine asserts unconstitutional retaliation in

the form of the following discipline: (1) he was barred from exercising responsibilities commensurate with his knowledge and experience; (2) he was excluded from NCCC staff meetings and assigned menial tasks; (3) he was subject to unfounded criticism and disciplinary action; (4) he was graded as unsatisfactory in a job performance evaluation and required to prepare and comply with a job performance improvement plan; and (5) he was terminated.  Anthoine contends that Defendants wrongfully retaliated against him for informing Freeman that NCCC was in violation of its legal obligation to provide regularly updated client information to the state; and for informing Upward Bound staff that Upward Bound may be in violation of the WIA for using funds on college preparatory classes, and that use of funds for this purpose was unfair to other programs.  Anthoine maintains that this speech is protected by the First Amendment because it was made as a citizen involving a matter of public concern, namely the proper and efficient expenditure of public funds. The Court disagrees.

Anthoine's statements made to Freeman regarding NCCC's purported failure to provide updated client information to the state are not protected by the First Amendment.  This is so because Anthoine uttered the speech as an employee pursuant to his official duties, not as a private citizen speaking on a matter of public concern.  See Ceballos, 547 U.S. at 421-24

(holding that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline). Although Anthoine initiated his communications with Freeman outside of work, his speech was nonetheless uttered pursuant to the execution of his responsibilities and official duties at NCCC because, as a program analyst, he was charged with monitoring local workforce development programs for compliance with the WIA and for ensuring that NCCC satisfied its obligation to timely gather and report the services being provided by workforce development programs to state and federal agencies administering the WIA.  Moreover, it is undisputed that Anthoine was assigned the task of processing a backlog of case management reporting data to the state in early January 2005, and that it was during the execution of these duties that he discovered NCCC was in violation of its legal obligation to provide regularly updated client information to the state.  Thus, to the extent that Anthoine's conversation with Freeman involved a complaint about a supervisor's alleged misconduct in connection with NCCC's duty to report client data to the state, this speech is not constitutionally protected because it owed its existence to Anthoine's professional responsibilities, that is, the speech is not protected by the First Amendment because it was related to

activities that Anthoine undertook in a professional capacity to

further NCCC's objectives, and was uttered as an employee

pursuant to his official responsibilities, not while acting as a

private citizen.  See Ceballos, 547 U.S. at 421-22 ("Restricting

speech that owes its existence to a public employee's

professional responsibilities does not infringe any liberties

the employee might have enjoyed as a private citizen.  It simply

reflects the exercise of employer control over what the employer

itself has commissioned or created."); see also Freitag v.

Ayers, 468 F.3d 528, 546 (9th Cir. 2006) (internal complaints

about supervisory failures or workplace mismanagement are

consistent with the type of activities the employee is

professionally obligated to perform); Hong v. Grant, 516

F.Supp.2d 1158, 1166 (C.D. Cal. 2007) (an employee's official

duties are construed broadly to include those activities that an

employee undertakes in a professional capacity to further the

employer's objectives).  Accordingly, because Anthoine's

statements in this regard indicate that he was fulfilling a

professional obligation, and not acting as a private citizen,

the statements are not constitutionally protected.[4]

---

[4] Because Anthoine does not argue that any of the other
statements he made to Freeman during the January 2005 meeting
qualify as protected speech under the First Amendment, the Court
treats any First Amendment retaliation claim based thereon as
abandoned.

Anthoine's statements to Upward Bound staff members concerning Upward Bound's use of funds for college preparatory classes are also not constitutionally protected because they were made pursuant to Anthoine's official duties.  It is undisputed that Anthoine was assigned to monitor the Upward Bound program on behalf of NCCC (which included, among other things, ensuring compliance with the WIA and providing assistance and technical guidance to support Upward Bound's success), and that Anthoine told Upward Bound staff that the funds allocated to college preparatory classes may be in violation of the WIA.  Indeed, Anthoine concedes that he was exercising his duty to provide monitoring guidance to Upward Bound when he told Upward Bound staff members that he interpreted the WIA regulations to prohibit the payment of funds to students for attending college preparatory classes.  It is also undisputed that Anthoine told Upward Bound staff members that, in his opinion, Upward Bound's use of funds for college preparatory classes was unfair to other programs because the intent of the WIA is to provide funds for work experience to disadvantaged youth who do not plan on attending college.  Thus, while Anthoine's official duties did not include assessing whether a particular program's use of funds was fair to other programs, his duties did include monitoring the use of funds by programs for compliance with the WIA and to provide assistance

17

and technical guidance to support program success.  As such,
Anthoine's opinion as to the propriety of Upward Bound's
allocation of funds owes its existence to his professional
responsibilities as a program analyst for NCCC insofar as it was
related to activities that Anthoine undertook in a professional
capacity to further NCCC's objectives, and was uttered pursuant
to his official duties while acting within the scope of his
employment, not while acting as a private citizen.  See
Ceballos, 547 U.S. at 421-23; see also Brammer-Hoelter v. Twin
Peaks Charter Academy, 492 F.3d 1192, 1203 (10th Cir. 2007) (if
an employee engages in speech during the course of performing an
official duty and the speech reasonably contributes to or
facilitates the employee's performance of the official duty, the
speech is made pursuant to the employee's official duties).
Because these statements were made during the course of
Anthoine's daily professional activities and were related to
official duties that he was charged with performing, his
supervisors had the authority to take the proper corrective
action if they believed the statements to be inflammatory or
misguided because supervisors have an interest in ensuring that
official communications are accurate, demonstrate sound
judgment, and promote the employer's mission.  See Ceballos, 547
U.S. at 422-24 (the First Amendment does not prohibit managerial
discipline based on an employee's expressions made pursuant to

official responsibilities).  Accordingly, Anthoine's statements to Upward Bound staff members are not constitutionally protected, and therefore he has no First Amendment claim based on Defendants' reaction to it.

Because the Court concludes that Anthoine did not speak as a citizen with regard to the speech at issue, the Court need not reach the remaining factors to establish a First Amendment retaliation claim.  Absent protected speech, there is no cognizable retaliation claim.  Accordingly, summary adjudication is granted in favor of Defendants on Anthoine's First Amendment retaliation claim.

C.   Second Claim: Gender Discrimination

Defendants argue that summary adjudication is appropriate with respect to Anthoine's gender discrimination claim because: (1) there is no evidence of discriminatory intent; (2) Defendants had legitimate, nondiscriminatory reasons for their actions; and (3) Anthoine cannot show any evidence of pretext.

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the United States Supreme Court articulated a three-part test for assessing the burdens and order of proof in a Title VII case alleging discriminatory treatment.  First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination.  Id. at 802.  Second, if the plaintiff succeeds in demonstrating a prima facie case, the

burden shifts to the defendant to "articulate some legitimate,

nondiscriminatory reason for the employee's rejection."  Id.

Third, should the defendant carry this burden, the plaintiff

then has an opportunity to prove by a preponderance of the

evidence that the legitimate reasons offered by the defendant

were not its true reasons but were a pretext for discrimination.

Id. at 804.  To establish pretext, a plaintiff may do so by

directly persuading the court that a discriminatory reason more

likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence.

Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir.

1998).  A plaintiff may sustain their burden to show pretext by

using either direct or circumstantial evidence.  Coghlan v.

American Seafoods Co. LLC., 413 F.3d 1090, 1094-95 (9th Cir.

2005).  When the plaintiff relies on circumstantial evidence,

that evidence must be "specific and substantial" to avoid

summary judgment.  Id. at 1095.

     In the present case, Anthoine relies exclusively on

circumstantial evidence to establish a prima facie case of

gender discrimination.  In this regard, Anthoine offers the

following evidence: (1) his testimony that Brown's tone of voice

and non-verbal behavior was noticeably more positive when she

engaged with female employees as opposed to male employees; (2)

documentary evidence that two female employees received higher

20

performance evaluation grades than all three NCCC male employees

for the 2004 performance evaluation grading period; and (3)

documentary evidence that all three male NCCC employees were

terminated on the same day.  Even assuming for the sake of

argument that Anthoine produced sufficient evidence to establish

a prima facie case of gender discrimination, Defendants have

articulated legitimate nondiscriminatory reasons for the various

complained of conduct.  Anthoine maintains that the evidence he

produced in response to Defendants' motion for summary judgment

is sufficient to raise a triable issue of material fact as to

whether his verbal reprimand (for his comments made to Upward

Bound staff) and his subsequent termination were "falsely

overblown and hence pretextual."[5]  Specifically, Anthoine argues

that Brown and Newton, acting out of gender bias, exaggerated

his behavior during his monitoring appointment with Upward Bound

to create the justification for his termination.  The Court

finds, however, that Anthoine failed to sustain his burden to

produce specific, substantial evidence raising a triable issue

of material fact on the question of whether Defendants' stated

reasons for his verbal reprimand and subsequent termination were

---

[5] To the extent that Anthoine failed to respond to the
nondiscriminatory reasons proffered by Defendants for the other
complained of conduct in which Anthoine alleges was motivated by
gender discrimination, the Court will treat Anthoine's failure
in this regard as an abandonment of his contention that such
conduct constituted illegal gender discrimination.

really a pretext for illegal gender discrimination.  The undisputed facts demonstrate that Anthoine had a long history of performance issues, including an inability or unwillingness to follow directions and the philosophy of NCCC.  It is also undisputed that, despite being warned in writing by Newton in February 2005 to refrain from taking action that is not approved by his supervisor, and despite knowing that both Newton and Brown did not agree with his assessment that Upward Bound's use of funds for college preparatory classes violated the WIA, Anthoine nonetheless told Upward Bound staff members that Upward Bound's use of funds for this purpose may be in violation of the WIA.  In short, the Court finds Defendants' articulated nondiscriminatory reasons for Anthoine's termination to be credible.

Additionally, the Court finds that Anthoine did not sustain his burden to produce specific, substantial evidence demonstrating that a discriminatory reason more likely motivated his termination rather than the reasons proffered by Defendants. In this regard, Anthoine did not produce meaningful evidence raising a triable issue of material fact on the question of whether Defendants were biased or harbored discriminatory animus insofar as the evidence produced by Anthoine has little direct bearing on the specific intentions of Defendants in terminating him.  See Aragon v. Republic Silver State Disposal Inc., 292

F.3d 654, 663 (9th Cir. 2002) (noting that in disparate

treatment cases, statistical evidence (such as evidence that

four out of five people laid off (out of 28 total employees)

were African American), in and of itself, rarely suffices to

rebut an employer's legitimate, nondiscriminatory rationale for

its decision to dismiss an individual employee because a

company's overall employment statistics generally have little

direct bearing on the specific intentions of the employer when

dismissing a particular individual).  Anthoine's statistical

evidence does not show a stark pattern of discrimination

unexplainable on grounds other than gender.  It also does not

account for possible nondiscriminatory variables,[6] such as job

performance.  Because such evidence is not supported by other

probative evidence of illegal discrimination, the Court

concludes that this evidence falls short of constituting

substantial and specific evidence of illegal gender

discrimination.  See id. at 663-64.  Anthoine, for instance, did

not point to evidence indicating that the 2004 employee

performance evaluations were based on anything other than job

---

[6] Interestingly, although Defendants did not proffer NCCC's
reorganization and downsizing as a legitimate nondiscriminatory
reason for Anthoine's termination, Anthoine concedes that NCCC's
reorganization and downsizing were significant contributing
factors in his termination.  Defs.' UMF ¶¶ 115-116. In fact,
Anthoine acknowledges that Brown sought to eliminate the
positions occupied by the other two male NCCC employees as part
of a plan to reorganize NCCC.

performance.  Nor does the Court find Anthoine's belief that

Brown's tone of voice and nonverbal behavior was noticeably more

positive when she engaged with female employees to be

substantial and specific evidence of illegal gender

discrimination demonstrating that there is a genuine issue for

trial.  See Rodriguez v. International Business Machines, 960

F.Supp. 227, 231 (N.D. Cal. 1997) (a plaintiff's subjective

belief that his employers actions were discriminatorily

motivated is not sufficient to withstand summary judgment).  In

sum, the evidence offered by Anthoine does not undermine the

reasons proffered by Defendants for his termination, nor is it

sufficient evidence to indicate that either Brown or Newton

harbored discriminatory animus toward men in general or Anthoine

in particular.  Accordingly, because Anthoine did not

demonstrate that the Defendants legitimate, nondiscriminatory

reasons for his termination were a pretext for illegal gender

discrimination, summary adjudication is granted in favor of

Defendants on Anthoine's gender discrimination claim.

D.    Third Claim: Violation of Procedural Due Process

     Defendants argue that summary adjudication is appropriate

with respect to Anthoine's due process property interest claim

because Anthoine did not have a protected property interest in

continued employment with NCCC and because Anthoine was provided

a proper opportunity to be heard prior to his termination.

Additionally, Defendants argue that summary adjudication is appropriate with respect to Anthoine's due process liberty interest claim because Defendants did not publish false, stigmatizing statements in connection with Anthoine's termination.

The procedural due process component of the Fourteenth Amendment protects individuals against the deprivation of liberty or property by the government without due process.  "A section 1983 claim based upon procedural due process . . . has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process."  Portman v. County of Santa Clara, 995 F.2d 898, 904 (9th Cir. 1993).  The essential requirements of due process are notice and an opportunity to respond, i.e., opportunity to present reasons, either in person or in writing, why proposed action should not be taken. Cleveland Board of Education v. Loudermill, 470 U.S. 532, 546 (1985).  However, an individual is only entitled to procedural due process if he was deprived of a protected property or liberty interest.  See Clements v. Airport Authority of Washoe County, 69 F.3d 321, 331 (9th Cir. 1995).

A government employee has a constitutionally protected property interest in continued employment when the employee has a legitimate claim of entitlement to the job.  Portman, 995 F.2d

at 904 (citing <u>Board of Regents v. Roth</u>, 408 U.S. 564, 577

(1972)).  Laws, rules or understandings derived from independent

sources such as state law create such claims of entitlement.

<u>Portman</u>, 995 F.2d at 904.  The existence of an entitlement

amounting to a property right may be established through

agreement, express or implied, limiting the public employer's

right to dismiss absent sufficient cause.  <u>Figueroa v. Housing</u>

<u>Authority</u>, 131 Cal.App.3d 528, 532 (1982).  If an employee is

subject to discharge only for cause, then the claimant has a

property interest which is entitled to constitutional

protection.  <u>Id.</u>  However, a mere expectation that employment

will continue does not create a property interest.  <u>Portman</u>, 995

F.2d at 904.  Thus, if under state law, employment is at-will,

then the claimant has no property interest in the job.  <u>Id.</u>

     "The liberty interest protected by the due process clause

encompasses an individual's freedom to work and earn a living."

<u>Portman</u>, 995 F.2d at 907 (internal quotation marks omitted).

"[W]hen the government dismisses an individual for reasons that

might seriously damage his standing in the community, he is

entitled to notice and a hearing to clear his name."  <u>Id.</u>

(internal quotation marks omitted).  However, in order to

implicate constitutional liberty interests, the reasons for

dismissal must be sufficiently serious to "stigmatize" or

otherwise burden the individual so that he is not able to take

advantage of other employment opportunities.  Id.  Injury to

reputation standing alone does not violate the Due Process

Clause of the Fourteenth Amendment.  Wenger v. Monroe, 282 F.3d

1068, 1074 (9th Cir. 2002).  Rather, due process protections

apply only if a plaintiff is subjected to "stigma plus," i.e.,

if the government makes a charge against a plaintiff that might

seriously damage his standing and associations in the community,

and (1) the accuracy of the charge is contested, (2) there is

some public disclosure of the charge, and (3) it is made in

connection with the termination of employment or the alteration

of some right or status recognized by state law.  Id.  A

government employee is entitled to a name-clearing hearing "if

the employer creates and disseminates a false and defamatory

impression about the employee in connection with his

termination."  Brady v. Gebbie, 859 F.2d 1543, 1553 (9th Cir.

1988) (internal quotation marks omitted).

> 1. Due Process Violation Premised on Protected Property
>    Interest

Anthoine maintains that Defendants deprived him of a

constitutionally protected property interest in continued

employment by terminating him without providing an opportunity

to contest the charges in a pre-termination hearing.  To support

this claim, Anthoine did not point to a statute, rule or policy

giving him a property interest in continued employment; rather,

he points to a provision of NCCC's personnel rules ostensibly for the purpose of demonstrating that NCCC had a policy of corrective discipline, and that such a policy is inconsistent with a policy of at-will employment.  In other words, Anthoine points to the provision for the purpose of demonstrating that he was only terminable for cause.  Anthoine's argument is misplaced and unpersuasive.

This provision, titled, "Employee Discipline Procedures," sets forth the purpose and reasons for taking disciplinary action against employees as well as the steps and procedures to be followed in disciplining an employee.  This provision states, in relevant part, that "the purpose of disciplinary action is to improve employee performance" and that "[d]isciplinary actions are corrective and progressive in nature."  The Court finds this evidence, standing alone, insufficient to avoid summary judgment because it does not establish a triable issue of material fact as to whether Anthoine was only terminable for cause, that is, it does not demonstrate that Anthoine had a property interest which is entitled to constitutional protection.  See Davis v. Consolidated Freightways, 29 Cal.App.4th 354, 367 (1994) (the use of a "progressive discipline" policy does not rebut the presumption of at-will employment).  Moreover, the Court finds that this claim does not survive summary judgment because the undisputed facts demonstrate that NCCC complied with procedural

due process requirements insofar as it provided Anthoine proper notice of the charges, an explanation of the evidence, and an opportunity to be heard prior to termination.  See Clements, 69 F.3d at 331 (Under a due process analysis, plaintiff must receive notice and an opportunity to be heard "before he is deprived of any significant property interest.").  An "elaborate" pre-termination hearing is not required; rather, only "some kind of hearing" must be afforded the employee prior to termination.  Id. at 332.  "The essential requirements of this pre-termination process are *notice* and *an opportunity to respond.*"  Id. (emphasis in original).  Here, it is undisputed that Anthoine received notice of his termination, in writing, from Brown on May, 20 2005, outlining the reasons for his termination.  It is also undisputed that this notice expressly advised Anthoine that he had the right to respond to the charges against him prior to the effective date of his termination by contacting the Interim Director of NCCC and/or by appealing the decision to the Board.  Anthoine does not dispute receiving this letter, nor its contents.  Thus, the notice requirement was met.

As to whether Anthoine received the requisite meaningful opportunity to respond, it is undisputed that Anthoine requested a hearing before the Board on May 25, 2005, and that on May 26, 2005, the parties mutually agreed to forego the hearing before the Board so they could arbitrate, among other things, whether

Anthoine's termination was appropriate under NCCC's personnel rules.  Based on the foregoing, the Court finds that Anthoine was afforded a sufficient opportunity to be heard prior to his termination to satisfy constitutional due process requirements. The fact that Anthoine chose to arbitrate the propriety of his termination rather than present his case to the Board does not make the process afforded to him constitutionally deficient. Accordingly, summary adjudication is granted in favor of Defendants on Anthoine's due process protected property interest claim.

      2. <u>Due Process Violation Premised on Protected Liberty Interest</u>

      Anthoine maintains that Defendants deprived him of a constitutionally protected liberty interest by publishing false reasons for his termination without providing a pre-termination name clearing hearing.  The Court disagrees.  The undisputed evidence demonstrates that the reasons for Anthoine's dismissal (e.g., unsatisfactory performance, insubordination, and discourteous treatment of the public or other employees) were not sufficiently serious to "stigmatize" or otherwise burden Anthoine such that he is unable to take advantage of other employment opportunities.  See <u>Portman</u>, 995 F.2d at 907 ("Charges that carry the stigma of moral turpitude such as dishonesty or immorality may implicate a liberty interest, but

charges of incompetence or inability to get along with others do not.") (internal quotation marks omitted); see also Gray v. Union County Intermediate Educ. Dist., 520 F.2d 803, 806 (9th Cir. 1975) (charges of "insubordination, incompetence, hostility toward authority, and aggressive behavior" are insufficiently stigmatizing to implicate a constitutional liberty interest). Here, none of the stated reasons for Anthoine's termination implicate a liberty interest.  The record in this case reflects that the charges against Anthoine focus on his inability to perform his job satisfactorily, follow directions and treat people courteously, not on dishonesty or moral turpitude.  As such, the charges do not infringe on a liberty interest. Accordingly, because the charges against Anthoine do not implicate a liberty interest, and because Antoine was provided an opportunity to be heard prior to his termination, summary adjudication is granted in favor of Defendants on Anthoine's due process protected liberty interest claim.

E.    Fourth and Fifth Claims: Wrongful Discharge in Violation of Public Policy

Defendants argue that summary adjudication is appropriate with respect to Anthoine's wrongful discharge in violation of

public policy claims because Anthoine was not terminated based on free speech retaliation or sex discrimination.[7]

Under California law an employer may be held liable for wrongful termination if it discharges an employee in contravention of fundamental public policy. Tameny v. Atlantic Richfield Co., 27 Cal.3d 167, 177 (1980); Green v. Ralee Engineering Company, 19 Cal.4th 66 (1998). To establish a claim of wrongful discharge in violation of public policy under California law, plaintiff must show: (1) that she was terminated from her employment; (2) that the termination was a violation of public policy, i.e., that there was a nexus between the termination and the plaintiff's status or protected activity; and (3) damages. Turner v. Anheuser-Busch, Inc., 7 Cal.4th 1238, 1258-59 (1994). Tort claims for wrongful discharge typically arise when an employer retaliates against an employee for "(1) refusing to violate a statute, (2) performing a statutory obligation, (3) exercising a statutory right or

---

[7] As an initial matter, the Court notes that Anthoine's Fourth and Fifth claims for relief can only be brought against NCCC. Under California law, it is well established that only an employer can be liable for the tort of wrongful discharge in violation of public policy. Khajavi v. Feather River Anesthesia Medical Group, 84 Cal.App.4th 32, 53 (2000). Accordingly, to the extent that Anthoine seeks to bring such claims against Newton and Brown, the Court grants summary adjudication in their favor.

privilege, or (4) reporting an alleged violation of a statute of public importance." Id. at 1256 (citations omitted).

    1. Wrongful Discharge Premised on Violation of California Constitution and WIA

    Anthoine's Fourth claim for relief seeks to state a claim for wrongful discharge in violation of fundamental public policies, namely the free speech clause of the California Constitution and the policies embedded in the WIA. Specifically, Anthoine claims he was retaliated against for complaining about violations of the WIA. However, as discussed above, because Anthoine did not demonstrate that the speech in question is constitutionally protected under the First Amendment, he cannot establish that he was wrongfully terminated in contravention of a fundamental policy of the California Constitution. With respect to Anthoine's claim that he was wrongfully discharged in violation of the public policies embedded in the WIA, the Court finds that Anthoine failed to establish a genuine issue for trial with regard to this claim. Anthoine did not identify the specific provisions of the WIA that would be violated by his termination. Anthoine's vague charge that the speech at issue is protected by the policies embedded in the WIA puts the Court in the position of having to guess the nature of the public policies involved in this claim. This kind of showing is insufficient to create a triable issue

of fact justifying a trial.  See <u>Turner</u>, 7 Cal.4th at 1256-57.

Accordingly, summary adjudication is granted in favor of

Defendants on Anthoine's wrongful discharge in violation of

public policy claim premised upon the free speech clause of the

California Constitution and the policies embedded in the WIA.

        2. <u>Wrongful Discharge Premised on FEHA Violation</u>

        Anthoine's Fifth claim for relief seeks to state a claim

for wrongful discharge in violation of the public policies

embedded in Government Code §§ 12940 <u>et seq.</u>, the California

Fair Employment and Housing Act ("FEHA"), which forbids

employers from discriminating against employees on the basis of

gender.  However, for the reasons discussed above, because

Anthoine failed to establish that Defendants' legitimate non-

discriminatory reasons for his termination were pre-textual,

and therefore failed to establish a meritorious gender

discrimination claim, Anthoine similarly cannot establish a

violation of FEHA.  See <u>Brooks v. City of San Mateo</u>, 229 F.3d

917, 923 (9th Cir. 2000) (California courts apply the <u>McDonnell</u>

<u>Douglas</u> burden shifting approach to claims brought pursuant to

FEHA and apply the same guiding legal principles).  In other

words, because Anthoine did not show that he was wrongfully

terminated based on gender discrimination, he cannot show that

he was wrongfully terminated based on a violation of the public

policies embedded in FEHA.  See <u>Esberg v. Union Oil Co.</u>, 28

Cal.4th 262, 272 (2002) (failure to establish a violation of
FEHA is fatal claim to a claim for wrongful termination in
violation of public policy based on FEHA).  Accordingly, summary
adjudication is granted in favor of Defendants on Anthoine's
wrongful discharge in violation of public policy claim premised
on FEHA.

F.   Sixth Claim: Defamation

     Defendants argue that summary adjudication is appropriate
with respect to Anthoine's defamation claim because Defendants
did not publish any defamatory statements about Anthoine, and
because Anthoine was not strongly compelled to publish
statements regarding his termination.  The Court agrees.

   "Defamation is an invasion of the interest in reputation.
The tort involves the intentional publication of a statement of
fact which is false, unprivileged, and has a natural tendency to
injure or which causes special damage."  Ringler Associates Inc.
v. Maryland Cas. Co., 80 Cal.App.4th 1165, 1179 (2000).
"Publication, which may be written or oral, is defined as a
communication to some third person who understands both the
defamatory meaning of the statement and its application to the
person to whom reference is made."  Id.  Publication to a single
individual is sufficient to satisfy the publication element of a
defamation claim.  Id.  In all cases of alleged defamation the
truth of the offensive statements or communication is a complete

defense against civil liability, regardless of bad faith or malicious purpose.  Id. at 1180.

Generally, when a defamed person voluntarily repeats a libelous communication to others, the originator of the defamatory statement is not liable for any ensuing damage. McKinney v. County of Santa Clara, 110 Cal.App.3d 787, 796 (1980).  However, there is an exception to this rule "where the originator of the defamatory statement has reason to believe that the person defamed will be under a strong compulsion to disclose the contents of the defamatory statement to a third person."  Id.  A "strong compulsion" may exist when a job seeker must tell a prospective employer the reasons he was terminated in order to explain away a negative job reference from his former employer.  Live Oak Publishing Co. v. Cohagan, 234 Cal.App.3d 1277, 1287 (1991); see also Davis, 29 Cal.App.4th at 373 (Self-publication of alleged defamatory statements may be imputed to the originator of the statement if the person defamed is operating under a strong compulsion to republish the defamatory statement, such as if a job seeker must tell a prospective employer what is in his personnel file in order to explain away a negative job reference.).

In the present case, Anthoine does not argue that Defendants published the reasons for his termination to any third party; rather, he argues that he self-published the

alleged defamatory statements to prospective employers because he felt "strongly compelled" to explain the reasons for his termination.  However, because Anthoine failed to show that NCCC ever gave him a negative job reference, or that he had reason to believe they would do so, the Court finds that Anthoine failed to raise a triable issue of material fact as to whether he was "strongly compelled" to publish the allegedly defamatory statements such that the publication may be imputed to NCCC. Accordingly, summary adjudication is granted in favor of Defendants on Anthoine's defamation claim.

G.   Rule 56(f)

Anthoine requests a continuance pursuant to Rule 56(f) because he was unable to secure the declaration of a witness he failed to depose.

A party requesting a continuance pursuant to Rule 56(f) must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment.  Tatum v. City and County of San Francisco, 441 F.3d 1090, 1100 (9th Cir. 2006) (citing Fed.R.Civ.P. 56(f)).  Failure to comply with the requirements of Rule 56(f) is a proper ground for denying discovery and proceeding to summary judgment.  See Weinberg v. Whatcom County, 241 F.3d 746, 751 (9th Cir. 2001).  The burden is on the party seeking additional discovery to proffer sufficient facts to show

37

that the evidence sought exists, and that it would prevent summary judgment.  Chance v. Pac-Tel Teletrac Inc., 242 F.3d 1151, 1161 n. 6 (9th Cir. 2001).  The district court does not abuse its discretion by denying further discovery if the movant has failed to diligently pursue discovery in the past.  Id.

In the present case, Anthoine requested a continuance pursuant to Rule 56(f) in his opposition to summary judgment. The Court finds this request plainly inadequate to justify a continuance.  See Weinberg, 241 F.3d at 751 (references in memoranda and declarations to a need for discovery do not qualify as motions under Rule 56(f)).  Moreover, even assuming that Anthoine's request for a continuance was not procedurally deficient, the Court nonetheless finds that Anthoine failed to sustain his burden to justify a continuance because he neither identified by affidavit the specific facts that further discovery would have revealed, nor did he explain why those facts would have precluded summary judgment.  Nor did Anthoine

///

///

///

///

///

///

adequately demonstrate that he diligently pursued his previous discovery opportunities.  Accordingly, Anthoine's request for a continuance pursuant to Rule 56(f) is denied.[8]


                              III. ORDER

     For the reasons set forth above, Defendants' motion for summary judgment is GRANTED.  The Clerk of the Court is directed to enter judgment in this matter in accordance with this Order.

     IT IS SO ORDERED.

Dated:  October 3, 2008        _____
                               JOHN A. MENDEZ,
                               UNITED STATES DISTRICT JUDGE

---

     [8] In light of the foregoing, the Court finds it unnecessary to consider Defendants' objections to evidence submitted by Anthoine in support of his opposition to Defendants' motion for summary judgment.  Docket at 53.